## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

STEVE WENTZ,

      Plaintiff,

v.                          CASE NO: 6:17-cv-01164-ORL-18GJK

PROJECT VERITAS, a Virginia
corporation; JAMES O'KEEFE III;
ALLISON MAASS; and BREITBART
NEWS NETWORK, LLC, a Delaware
company,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT

Defendants, Project Veritas, James O'Keefe III, and Allison Maass ("Maass") (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 56 and Section 768.295(4), Florida Statutes, respectfully request this Honorable Court render an Order granting final summary judgment in favor of Defendants, and against Plaintiff, Steve Wentz ("Wentz"), and state:

### I. Summary of Argument

After making incriminating public statements in a moment of candor, Wentz filed this frivolous lawsuit in a brazen attempt to save face. This is not the first time the press has been attacked after reporting a story that caused embarrassment to a public figure, nor will it be the last. Defendants accomplished in their reporting of Wentz's own statements that ideal to which journalism has always aspired – to spread the free flow of ideas and opinions on

matters of public interest and concern.[1] To be clear, this lawsuit is not about the publication of false statements, the kind defamation is meant to remedy. It is an attempt by a public school teacher and union leader to redress his own embarrassing public admission that he cornered a student after class and threatened to "kick his fucking ass" – conduct for which he was properly disciplined by his school-district employer. Wentz's attempt to curb Defendants' First Amendment Rights to report on public figures regarding public issues should be summarily rejected, and the Court should award Defendants their reasonable attorneys' fees in defending this lawsuit under Florida's prohibition of Strategic Lawsuits Against Public Participation statute ("anti-SLAPP statute").

The Court should also enter final summary judgment for Defendants on Wentz's defamation claims (Counts V, VI, VIII) because the allegedly defamatory statements were either true, opinion, or a mere recitation of Wentz's own admitted actions and statements. Wentz candidly admitted – in his operative Amended Complaint, during the School District's investigation into his threat of physical violence, and in deposition in this case – that he isolated a student after class and verbally threatened to "kick his fucking ass."[2]   His employer, Unified School District 259 ("School District"), admonished his "unprofessional conduct" concluding his "public statements would cause a reasonable person hearing them to question his judgment, composure, and professionalism, and cast doubt on the professionalism of the thousands of U.S.D. 259 teachers he was representing when he made the statements."[3]

---

[1]  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988).
[2]   Doc. 81, ¶¶ 35, 118; Interview Transcript, p. 15 (attached as Exhibit "A"); Dep. Wentz, p. 24, lns. 8-12 (attached as Exhibit "B").
[3]  Personnel Conference Summary, pp. 1-2 (attached as Exhibit "C").

The Court should also reject Wentz's contention that the publications take his words out of context. Wentz has yet to provide a single set of real or hypothetical circumstances that would justify his conduct, which is not surprising as no context exists in which a teacher telling a student that he will "kick his fucking ass" is appropriate. Indeed, by Wentz's own admission that statement was "over the line,"[4] and he apologized in his own words for teaching methods "fall[ing] outside the boundaries that society sets."[5] There is likewise no evidence that Project Veritas spliced Wentz's words to convey meaning he did not intend, and he admitted to making all of the statements published by Defendants. Wentz's defamation claims are simply not viable, and the Court should enter judgment in favor of Defendants on Counts V, VI, and VIII.

The Court should enter judgment for Defendants on Wentz's state and federal wiretapping claims (Counts I-IV) because the allegedly intercepted conversations occurred in a crowded convention center hotel bar and Panera Bread restaurant, in which no person could hold a reasonable expectation of privacy. Moreover, judgment must be entered in favor of Defendants on the federal and Kansas wiretapping claims based on the simple and undisputed fact that a participant of each conversation consented to its recording.

## II. Undisputed Material Facts

### A.  The Journalists and Wentz

Project Veritas is a media group dedicated to holding those in power accountable for their words and deeds, as all journalists should.[6] Like Ida Tarbell with Standard Oil

---

[4]  The full video at issue here (the "Video") can be accessed at: Veritasvisuals, *Teachers Union President to Kid: "I Will Kick Your F\*\*\*ing Ass"*, YOUTUBE (June 28, 2016), https://www.youtube.com/watch?v=YheNaAEPev8.
[5]  Letter of Apology (attached as Exhibit "D").
[6]  Declaration of Project Veritas, ¶ 2 (attached as Exhibit "E").

Company, Upton Sinclair with Chicago's meatpacking plants, and Woodward and Bernstein with Watergate, Project Veritas' undercover journalism has been instrumental in bringing government corruption and fraud to light, specifically including exposing teachers' union corruption.[7] James O'Keefe is a political activist, journalist, and the founder of Project Veritas. Allison Maass and Dan Sandini ("Sandini") are journalists and videographers who worked for Project Veritas at all relevant times.[8] At the time he brought this lawsuit, Wentz was an employed teacher of the School District and president of the United Teachers of Wichita teachers' union ("UTW").[9] Wentz remains employed by the School District and was re-elected UTW's president in March 2018, despite his claimed reputational damages in this lawsuit.[10]

## B.  The Public Recording in Florida

In late June 2015, Project Veritas sent Maass to the National Council of Urban Education Association's conference to investigate corruption in teachers' unions.[11] Defendants did not specifically target Wentz; in fact, none knew who he was before the conversation depicted in the Video.[12] To record that conversation and other conversations at the conference, Maass used a small camera that could be hooked up to a button on her clothing or purse.[13] One evening during the conference, Maass and Wentz started talking in a

---

[7]  Ex. "E," ¶ 3.
[8]  Ex. "E," ¶ 4; Declaration of Allison Maass, ¶ 2 (attached as Exhibit "F"); Declaration of Dan Sandini, ¶ 2 (attached as Exhibit "G").
[9]  Doc 81,¶ 20.
[10]  Ex. "B," p. 9, lns. 8-21.
[11]  Dep. Maass, p. 37, lns. 9-21, attached as Composite Exhibit "H;" Doc 81, ¶ 22.
[12]  Ex. "H," p. 78, lns. 2-12; Ex. "F," ¶ 4; Ex. "E," ¶ 7.
[13]  Ex. "H," p. 23, lns. 2-17.

4

bar adjacent to one of the conference hotel lobbies.[14] Maass consented to the recording of the conversation.[15]

During the recorded conversation, an acquaintance of Wentz, Joey Matthews ("Matthews"), sat next to Wentz and Maass and engaged in the conversation.[16]



As can be seen on the Video freeze-frame at 3:28 above, Wentz addressed Matthews directly at least once during the conversation regarding how a union in Virginia – where Matthews lives – would handle Wentz's inappropriate conduct.[17] Maass, Wentz, and Matthews also spoke to the bartender sometimes, who was serving drinks at the bar at which they sat.[18]

---

[14] Ex. "H pp. 112-13, lns. 15-8; Doc 81, ¶¶ 26-33.
[15] Ex. "F," ¶ 5.
[16] Ex. "H" p. 114, lns. 1-14.
[17] Ex. "B" p. 62, lns. 3-10; Video (https://www.youtube.com/watch?v=YheNaAEPev8) at 3:28.
[18] Ex. "H" p. 115,  lns. 8-15.

5

The Video clearly captures the background noise of at least several other conversations occurring off frame, but close enough to be picked up by the camera's microphone.[19] To comply with the law, Project Veritas provides direction to its journalists and videographers about where they can and cannot legally record audio/video depending on the jurisdiction of the assignment.[20] In this instance, Maass was briefed by Project Veritas on Florida's recording laws, and instructed to only record audio/video in public places.[21]

At the crowded bar with at least two other individuals participating in the conversation, Maass captured Wentz's boastful story of student abuse, in which Wentz cornered a student after class, lowered the window shades, and told the child, "You really wanna kick my ass? You really think I'm a 'motherfucker'? Son, go for it. I'll give you the first shot. But be sure to finish what you start because, if you don't, I guarantee you, I will kick your fucking ass."[22]

### C. The Public Recording in Kansas

Months later, Project Veritas sent Sandini to Wichita to confirm the story Wentz told Maass.[23] Sandini met Wentz at a Panera Bread, where several other people were present.[24] The Panera Bread was public enough that Wentz felt "concerned about [Sandini's] language."[25] Specifically, Wentz described Panera Bread as an inappropriate place to use the word "fucking"[26] – a trait Panera Bread apparently does not share with a classroom. At the

---

[19] Ex. "B," p. 36, lns. 8-14; *see* Video (https://www.youtube.com/watch?v=YheNaAEPev8).
[20] Ex. "E," ¶ 5.
[21] Ex. "H" pp. 115-116, lns. 16-20.
[22] *See generally* the Video (https://www.youtube.com/watch?v=YheNaAEPev8); Doc. 81, ¶¶ 35, 118.
[23] Ex. "G," ¶ 3; Doc 81, ¶¶ 41, 47.
[24] Ex. "G," ¶ 3; Ex. "B," pp. 176-77, lns. 23-1.
[25] Ex. "B," p. 50, lns. 20-22.
[26] Ex. "B," p. 51, lns. 16-25.

Panera Bread, Sandini recorded his conversation with Wentz in which he asked Wentz if he had ever told a student "I will kick your fucking ass."[27] Wentz told Sandini he never said that to a student.[28] Sandini consented to the recording of this conversation.[29]

### D. The Video, the Wichita Public School Investigation, and Imposed Discipline

Project Veritas compiled portions of the two recordings into the Video at issue here and published it on June 28, 2016.[30] Wentz admitted to making all of the statements contained in the video.[31] Two days after the Video's publication, the School District hired outside counsel to interview Mr. Wentz about the incident reported by Project Veritas.[32] At the interview, Wentz admitted:

- to making the statements referenced above to a student after all of the other students had left the classroom, having pulled down the shades, locked the door, and pulled everything out of his pockets;[33]

- to making similar statements to other students "more than once;"[34]

- to not reporting the incident at issue here to an assistant principal or department head;[35]

- that he understood that neither the School District nor the UTW would condone his conduct;[36] and

- that he understood that threatening a student with physical violence cannot be tolerated by his employer.[37]

---

[27] Ex. "G," ¶ 5; Video (https://www.youtube.com/watch?v=YheNaAEPev8) at 6:45 to 7:05.
[28] Video (https://www.youtube.com/watch?v=YheNaAEPev8) at 7:02; Ex. "G," ¶ 5.
[29] Ex. "G," ¶ 6.
[30] Ex. "E," ¶ 9; Ex. "F," ¶ 9; Ex. "G," ¶ 8; Video (https://www.youtube.com/watch?v=YheNaAEPev8).
[31] Ex. "B," p. 75, lns. 7-24.
[32] Email Report, pp. 7-8 (attached as Exhibit "I").
[33] Ex. "A," p. 3.
[34] Ex. "A," pp. 4-5.
[35] Ex. "A," p. 8.
[36] Ex. "A," p. 10.
[37] Ex. "A," p. 15.

The interview resulted in a formal personnel conference on August 29, 2016, to
"address [Wentz's] unprofessional conduct."[38] The conference culminated in a Personnel
Conference Summary:

> Mr. Wentz was the subject of an on-line report published on June 28,
> 2016 by a web-site called *Project Veritas*.  The report under the
> headline: "Teachers Union President to Kids: I Will Kick Your
> F*****g Ass." In the video recording which is part of the report, Mr.
> Wentz can be heard telling his companions that on multiple occasions
> in the course of his employment (as a teacher assigned to Southeast
> High School) he threatened students with physical violence as a
> disciplinary technique.
> . . . .
> Mr. Wentz was recorded making these statements in June, 2015, in a
> public place, the bar at the hotel where the annual meeting of the
> National Counsel of Urban Education Associations was then taking
> place.
> . . . .
> Mr. Wentz's remarks were also republished on the multiple news
> platforms operated by at least three Wichita television stations (the
> CBS, ABC and NBC network affiliates), as well as those of the
> *Wichita Eagle*. As a result, it is reasonable to assume that tens-of-
> thousands of students, parents and U.S.D. 259 taxpayers heard or read
> that the elected representative of all Wichita teachers described in his
> own words how he invited students to take a "shot" at him, in which
> case he could "kick (their) fucking ass."[39]

The Personnel Conference Summary concluded that Mr. Wentz should be disciplined
for "engaging in unprofessional conduct," and that his "public statements would cause a
reasonable person hearing them to question his judgment, composure and professionalism,
and cast doubt on the professionalism of the thousands of U.S.D 259 teachers he was
representing."[40] Further, "Mr. Wentz admitted that he had in fact invited a student to take a
swing at him, in which case he would "kick (his) ass," which is a "violation of District policy

---

[38] Letter dated Aug. 26, 2016 from Shannon S. Krysl, Chief Human Resources Officer (attached as Exhibit "J").
[39] Ex. "C," p. 1.
[40] Ex. "C," p. 2.

regarding appropriate discipline . . . and could have given rise to civil exposure for or a criminal charge of assault."[41]

The personnel conference committee imposed the following discipline:

- placement of the Personnel Conference Summary in Wentz's personnel file "as a final written warning that conduct of the character described in the *Project Veritas* report will not be tolerated, and that evidence of further conduct along these lines will result in termination;"

- restriction of teaching assignments to middle school to avoid contact with students approaching adulthood;[42] and

- referral to Employee Assistance Program for purposes of training in cultural proficiency, maintaining appropriate teacher-student boundaries and positive disciplinary techniques.[43]

Mr. Wentz also wrote a letter of apology he titled "Mea Culpa," in which he espoused the message of taking "responsibility for your actions and clean up any 'mess' you make."[44] He "made this mess. [He] is accepting responsibility for it, and again, [he] is sorry for any pain that was caused by [his] actions."[45]

### E. Wentz's Claims and the Unidentified 'Omitted' Context

During his disciplinary hearing, and as the basis of his defamation claims by implication (Counts VI, VIII), Wentz claims Defendants omitted context from his statements that would have justified his conduct.[46] He also claims the music lyrics in the Video, "Look at his face! Look in his eyes! . . . Check out his lies!," is defamatory by indicating he is a liar.[47]

---

[41] Ex. "C," p. 2.
[42] Ex. "C," p. 2.
[43] Ex. "C," p. 3.
[44] Ex. "D."
[45] Ex. "D."
[46] Ex. "C," p. 1-2; Doc. 81, ¶¶ 14-15, 110, 139, 183.
[47] Doc. 81, ¶ 55.

Of course, faced with his admitted contradictory statements to Maass and Sandini, Wentz admitted at deposition that he lied:

> **Q: And you told Mr. Sandini, "I never said that to a student at school," correct?**
> A: That's correct. [48]
>
> …
>
> **Q: Do you remember what statement he was asking you about there?**
> A: Yes.
> **Q: What statement was that?**
> A: The statement did I ever tell a student I would kick his fucking ass.
> **Q: And you answered that question negatively?**
> A: I did.
> **Q: Is that a true answer?**
> A: No.
> **Q: It's a false answer?**
> A: It's a false answer. [49]

Other than the above-referenced song lyrics, Wentz has yet to identify a single statement in the Video about him that is false. [50]

Likewise, although the unedited video files of both recordings were produced on April 27, 2018, Wentz has yet to identify the "key parts" of his recorded statements wrongfully omitted by Defendants to present his statements "out of context." [51]  As the School District concluded, and Wentz admitted during its investigation, no context could justify threatening a student with physical violence;[52] he has yet to provide a single example.  At his deposition, Wentz testified:

---

[48] Ex. "B," p. 25, lns. 3-5.
[49] Ex. "B," p. 27, lns. 4-15.
[50] Ex. "B," pp. 58-62, lns. 2-2.
[51] Ex. "B," p. 22, lns. 5-7; Doc. 81, ¶ 139(f)
[52] Ex. "A," p. 15.

> **Q: Is it your contention that there are some set of circumstances which would justify the use of the word "fucking" by a teacher to a student in the classroom?**
> A: Yes.
> **Q: Can you please give us an example of such a set of circumstances.**
> A: No.
> **Q: You're refusing to answer that question?**
> A: I don't have an example.
> **Q: But you think that there is an example?**
> A: I think there could be.
> **Q: But you cannot provide one?**
> A: That is correct.
>     MS. CONLIN: Object to form.[53]

Wentz was properly disciplined by the School District for the conduct exposed by Defendants' reporting and, despite his reaching allegations, he cannot identify a single statement made by any Defendant that is untrue or context omitted that would justify his actions. The Court should uphold the integrity of the independent media, which accomplished the ideals of journalism in this case by exposing Wentz's unacceptable behavior, for which he was sanctioned, and enter summary judgment in Defendants' favor.

## III. <u>Argument and Memorandum of Law</u>

### A. *Legal Standard*

Defendants respectfully incorporate the Eleventh Circuit's burden-shifting summary judgment standard explained in *Abdullah v. Osceola Cty. Sheriff*, Case No: 6:14-cv-629-Orl-40TBS, 2015 WL 5915818, at *2-3 (M.D. Fla. Oct. 8, 2015) ("If the movant shows an absence of evidence to support the nonmoving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts" preventing summary judgment.) (internal marks and citations omitted). Moreover,

---

[53] Ex. "B," pp. 54-55, lns. 20-8.

> A person or governmental entity in this state may not file or cause to be filed, through its employees or agents, any lawsuit, cause of action, claim, cross-claim, or counterclaim against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the Unites States Constitution and s. 5, Art. I of the State Constitution.

§ 768.295(3), Fla. Stat. "[P]rohibiting such lawsuits . . . will preserve this fundamental state policy, preserve the constitutional rights of persons in Florida, and assure the continuation of representative government in this state." § 768.295(1), Fla. Stat. A District Court does not abuse its discretion in applying and awarding attorneys' fees under a state anti-SLAPP statute. *Tobinick v. Novella*, 884 F.3d 1110, 1119 (11th Cir. 2018).

**B. No Viable Claim for Defamation (Counts V, VI, VIII)**

Defamation protects against the publication of false statements. Now, more than a year after this case was filed, Wentz has yet to identify a single false statement published by Defendants. The Court should also reject Wentz's claim that the Video defames him by implication because he has not identified facts omitted by Defendants to create defamatory implication or any context by which his actions and statements could be justified. Finally, Wentz failed to establish any Defendant acted with actual malice – a requisite showing for public-figure defamation plaintiffs.

    i. The Allegedly Defamatory Statements are True or Opinion and, Thus, Not Actionable

All of the published statements in the Video are true, or merely the opinion commentary of Defendants. Other than a lyrical verse implying Wentz lied – to which he

12

admitted – Wentz has not identified a single published statement that he claims is false.[54]
"[A] statement on matters of public concern must be provable as false before there can be
liability under state defamation law, at least in situations . . . where a media defendant is
involved." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990) (citing *Phila.
Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986)). Likewise, it is well-established in Florida
that "a required element of defamation is a false statement." *Cape Publications, Inc. v.
Reakes*, 840 So. 2d 277, 279 (Fla. 5th DCA 2003) (collecting cases). Because Wentz has not
– and cannot – identify a single published statement by Defendants that is false, his
defamation claims fail as a matter of law. *Id.* (reversing plaintiff's verdict based on true
statements for failure to present *prima facie* case of defamation).

> ii. No Evidence of Omitted Facts or Justifiable Context

Wentz's unsupported assertion that creative editing and the use of background music
defamed him also fails as a matter of law. Under well-established Florida law, defamation by
implication requires the publication of literally true statements in a way to create a false
impression. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *Coton v.
Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1315 (M.D. Fla. 2010). The claim
arises when a defendant (a) juxtaposes a series of facts so as to imply a defamatory
connection between them, or (b) creates a defamatory implication by omitting facts such that
she may be held responsible for the defamatory implication. *Rapp.*, 997 So. 2d at 1106. For
example, a movie company's unauthorized use of a photographer's self-portrait on the
package of a pornographic movie is defamation by implication because it falsely suggests a

---

[54] Ex. "B," pp. 27, lns. 4-15; 58-62, lns. 2-2.

connection between the photographer and the pornographic movie. *Coton*, 740 F. Supp. 2d at 1314.

Here, Project Veritas merely published Wentz's story as he told it in a public bar. While it is true that the Video is edited, none of the edits alter the meaning of Wentz's words or associate him improperly with some unrelated topic or conduct. Wentz told his story about threatening a student with physical violence, Defendants reported it, and the School District disciplined him for it.[55] The damaging statements in this case come from Wentz's own mouth, and Wentz cannot identify "key parts" of the recordings omitted by Defendants to present his statements "out of context" to prove his defamation by implication claim.[56] Indeed, no justifying portion or context exists.[57]

### iii. No Showing of Actual Malice

As a public figure in the public controversy of corruption in teachers' unions and student abuse, Wentz – the president of the UTW – must prove actual malice to prevail on his claims for defamation. *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1493 (11th Cir. 1988); *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43 (Fla. 4th DCA 2010). In determining the status of a defamation plaintiff as a limited public official, the Court must "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether the alleged defamation was germane to the plaintiffs' participation in the controversy." *Silvester*, 839 F.2d at 1494. (*citing Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). Wentz is a limited public figure

---

[55] *See generally* the Video (https://www.youtube.com/watch?v=YheNaAEPev8); Ex. "C," pp. 2-3.
[56] Doc. 81, ¶ 139.
[57] Ex. "B," pp. 54-55, lns. 20-8.

under the *Waldbaum* test because (a) the public controversy of union corruption and student abuse is more than merely newsworthy and of legitimate public concern, (b) as president of the UTW, Wentz was sufficiently involved in the controversy, and (c) the alleged defamatory statements were germane to Wentz's participation in the controversy. *Id.* at 1496-97.

Under the first prong, "[t]he public is legitimately interested in all matters of corruption," *Silvester*, 839 F.2d at 1493, and "[i]f the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern." *Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996). The controversy of (and reporting on) teachers' union corruption and student abuse existed long before Project Veritas reported Wentz's statements, and has "received public attention because its ramifications will be felt by persons who are not direct participants." *Waldbaum*, 627 F.2d at 1296. The public nature of this controversy is underscored by the highly regulated nature of unions,[58] the tens of millions of public school students and families affected by teachers' unions, and the cost to hundreds of millions of taxpayers that fund teacher unions and pay their leaders' salaries and benefits.[59] *Silvester*, 839 F.2d at 1494-95 (noting the existence of the controversy before the alleged defamation, regulation of the industry in controversy, and effect on tax payers and the public contributed to a finding of public controversy under first prong of *Waldbaum* test).

Wentz is intimately involved in the public controversy under the second prong because he (a) purposefully pursued a leadership position in a teachers' union from which he

---

[58] *See e.g.,* 29 U.S.C. §§ 151-169 (National Labor Relations Act).
[59] Suzanne Perez Tobias, *Teachers union president still employed by Wichita district*, WICHITA EAGLE http://www.kansas.com/news/local/education/article108937812.html (last visited Sept. 18, 2018).

could try to influence the outcome of the public controversy, and (b) could be realistically expected – as the president of a 4200-member teachers' union[60] – to have an impact on its resolution. *Silvester*, 839 F.2d at 1496. Courts routinely find union leaders to be public officials in controversies related to their union agenda. *See e.g.*, *Guam Fed'n of Teachers, Local 1581, of Am. Fed'n of Teachers v. Ysrael*, 492 F.2d 438, 439 (9th Cir. 1974) (officers of a teachers' union were public figures); *Henry v. National Ass'n of Air Traffic Specialists*, 836 F. Supp. 1204, 1206 n.3, 1211 n.6 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994) (elected union leaders of 1,700-member union were public figures); *Batson v. Shiflett*, 602 A.2d 1191, 1210 (Md. 1992) (elected president of local union was a public figure); *Lins v. Evening News Ass'n*, 342 N.W.2d 573, 580 (Mich. Ct. App. 1983) (union officers were limited public figures); *City Firefighters Union, Local 28 v. Duci*, 428 N.Y.S.2d 772, 775-76 (N.Y. Sup. Ct. 1976) (union officers were public figures).  As the leader of UTW, Wentz is sufficiently involved in the public controversy to satisfy the second prong of *Waldbaum*.

Finally, the allegedly defamatory statements are self-evidently germane to the public controversy of teachers' union corruption and student abuse, and actually led to the School District's discipline of Wentz for "threaten[ing] students with physical violence as a disciplinary technique."[61] The committee was particularly concerned that Wentz's comments would reflect poorly on the "thousands of U.S.D. 259 teachers he was representing."[62] Because Wentz qualifies as a public figure for purposes of teachers' union corruption and student abuse, he must prove actual malice to prevail on his defamation claims.

---

[60] *About the United Teachers of Wichita*, UNITED TEACHERS OF WICHITA, http://utw-ks.org/about-the-united-teachers-of-wichita/ (last visited Sept. 18, 2018).
[61] Ex. "C," p. 1.
[62] Ex. "C," p. 2.

But, Wentz failed to even allege that Project Veritas acted with actual malice by publishing defamatory material "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). "Knowledge of falsity is self-explanatory." *Silvester*, 839 F.2d at 1498. "The determination of whether defendants acted with reckless disregard is subjective and requires the plaintiff to show that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, (1968)). Here, there are no allegations that Project Veritas had knowledge of the allegedly defamatory statements' falsity or entertained doubts about the truth of the publication. In fact, Wentz admitted to all of the published statements and conduct, and was properly disciplined by the School District for his intolerable behavior. The Court should grant summary judgment in favor of Defendants on Counts V, VI, and VIII.

### iv. Equity Cannot Enjoin Speech

Wentz also seeks an unconstitutional injunction on Project Veritas' past and future speech (Count VIII). Florida law prohibits injunctive relief for actual or threatened defamation. *United Sanitation Servs. of Hillsborough, Inc. v. City of Tampa*, 302 So. 2d 435, 439 (Fla. 2d DCA 1974) (citing *Reyes v. Middleton*, 17 So. 937 (Fla. 1895)); *Vrasic v. Leibel*, 106 So. 3d 485, 486 (Fla. 4th DCA 2013) (reversing an injunction enjoining speech and stating that Florida courts have long held that temporary injunctive relief is not available to prohibit the making of defamatory or libelous statements); *Weiss v. Weiss*, 5 So. 3d 758, 760 (Fla. 5th DCA 2009) (equity will not enjoin actual or threatened defamation). Such injunctions are presumptively unconstitutional prior restraints on speech, and the Court

should enter judgment in favor of Defendants on Count VIII. *Near v. Minnesota*, 283 U.S. 697, 723 (1931); *Animal Rights Found. of Fla., Inc. v. Siegel*, 867 So. 2d 451, 457 (Fla. 5th DCA 2004).

### C. No Viable Claims for Unlawful Wiretapping

Wentz's federal and Kansas wiretapping claims fail as a matter of law because Maass and Sandini each consented to the recording of their respective conversations.   Wentz's federal and Florida wiretapping claims fail for lack of any reasonable expectation of privacy in a crowded hotel bar.

### i. Single Party Consent (Counts I, II, IV)

Wentz brings four claims under federal (Counts I–II), Florida (Count III), and Kansas (Count IV) wiretapping laws. The federal and Kansas wiretapping claims fail because each are one-party consent jurisdictions; if at least one party to the recorded oral conversation consents to its recording, then the recording is not actionable. 18 U.S.C. § 2511(1)(d); Kan. Stat. Ann. 21-6101(1);[63] "When one party consents to the recording, the recording is not unlawful wiretap information that comes within the ambit of the Federal Wiretap Act." *Knautz v. Wilson*, No. 8:00–CV–189–T–23F, 2000 WL 33175037, *4 (M.D. Fla. 2000).[64] Here, at least one party to each of the recorded conversations, Maass and Sandini respectively, consented to the recording.[65]

---

[63] Wentz incorrectly cites Kan. Stat. Ann. § 22-2518, which proscribes improper wiretaps by law enforcement. Project Veritas is not law enforcement.

[64] Federal case law on the Wiretap Act "is generally, if not universally, treated as controlling authority" on the Kansas Wiretap Act. *Kansas v. Willis*, 643 P.2d 1112, 1114 (Kan. Ct. App. 1982).

[65] Ex. "F," ¶ 5; Ex. "G," ¶ 6.

ii. <u>No Reasonable Expectation of Privacy in Hotel Bar or Panera Bread</u>

Wentz's Florida wiretapping claim (Count III) fails because Florida law prohibits recording a person's oral communications *only* when they are "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." Fla. Stat. § 934.02(2). His Kansas and federal wiretapping claims (Counts I, II, and IV) similarly fail because, in order for "oral communications" [66] to be protected under the federal wiretap law, the individuals involved must have had a reasonable expectation of privacy in the conversation. *U.S. v. Peoples*, 250 F.3d 630, 636-37 (8th Cir. 2001).[67] Even under Florida's strict recording laws, Wentz lacked a reasonable expectation of privacy at a crowded hotel bar with at least two other individuals participating in the conversation. Likewise, Wentz lacked a reasonable expectation of privacy at a Panera Bread where there were other customers present and close enough to the conversation for Wentz to be concerned about Sandini's language.

Courts properly refuse to find a reasonable expectation of privacy in oral communications unless the person asserting Chapter 934 protection, at the time he made the oral communication: (a) had a subjective expectation of privacy; (b) which expectation society is prepared to recognize as "reasonable." *Florida v. Inciarrano*, 473 So. 2d 1272, 1275 (Fla. 1985). Similarly, in order to demonstrate a reasonable expectation of privacy in communication, as required for protection from interception under the federal wiretap statute, a person must have exhibited an actual, subjective, expectation of privacy that the

---

[66] "Oral communication" is a term of art under the federal wiretap law, referring only to communications uttered by a person reasonably expecting them to be private.. *Angel v. Williams*, 12 F.3d 786, 789-90 (8th Cir. 1993).

[67] Federal case law on the Wiretap Act "is generally, if not universally, treated as controlling authority" on the Kansas Wiretap Act. *Willis*, 643 P.2d at 1114.

expectation must be reasonable under the circumstances. *Huff v. Spaw*, 794 F.3d 543, 548-49 (6th Cir. 2015). Courts consider factors such as: "(1) the location where the communication took place; (2) the manner in which the communication was made; (3) the nature of the communication; (4) the intent of the speaker asserting Chapter 934 protection at the time the communication was made; (5) the purpose of the communication; (6) the conduct of the speaker; (7) the number of people present; and (8) the contents of the communication." *Brugman v. Florida*, 117 So. 3d 39, 49 (Fla. 3d DCA 2013) (Rothenberg, J., dissenting) (collecting cases). Under these factors and the requirements above, Wentz simply had no reasonable expectation of privacy during his conversations with Maass and Sandini.

     *a. The location of the communication*

     In Florida, Wentz told his story, loudly and without embarrassment, to Maass and Mr. Matthews in a crowded hotel bar. The video clearly shows people coming and going from the bar, and captures audio from several conversations occurring off frame. Clearly the conversation did not occur "in an enclosed area or in a secluded area," which would have stronger privacy protections, but in an open, public location halfway across the country from Wentz's home. *Cinci v. Florida*, 642 So. 2d 572, 573 (Fla. 4th DCA 1994). Courts are extremely reluctant to acknowledge an expectation of privacy in public places of open access. *E.g.*, *Stevenson v. Florida*, 667 So. 2d 410, 412-13 (Fla. 1st DCA 1996) (no expectation of privacy in conversation with two men outside a van on the road); *Gray v. Royal*, 181 F. Supp. 3d 1238, 1254–55 (S.D. Ga. 2016) (no expectation of privacy in work common area); *U.S. v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (no expectation of privacy in the common areas of an apartment building given that they were "open and

accessible not only to all the many tenants and their visitors, to the landlord and all its employees, to workers of various types, and to delivery people of all kinds, but also to the public at large"); *Ruiz v. State*, 416 So. 2d 32, 34 (Fla. 5th DCA 1982) (conversations in a restaurant, outdoors or a truck do not invoke the same expectation of privacy as conversations emanating from one's home); *Jarmuth v. Waters*, No. 1:04CV63, 2005 WL 5715172, *6 (N.D. W. Va. March 31, 2005) (no expectation of privacy during conversation in public restaurant with two strangers). In Kansas, Wentz spoke with Sandini in a Panera Bread, a place where there were enough other people present that he expressed concern about Sandini's language. A hotel bar and a Panera Bread are public places, accessible to customers, servers, bartenders, and other employees. Wentz cannot expect privacy in such open and accessible places. *See Miravalles*, 280 F. 3d at 1330.

    *b. The manner in which the communication was made and the speaker's conduct*

    Wentz's conduct does not evince an expectation of privacy. Courts in this Circuit have noted that "unless something is said to lead a listener to believe that statements are private (e.g. 'just between you and me,' 'off the record,' or 'can we discuss this matter in private?') such statements do not qualify as oral communications under the [federal] Wiretap Act." *Pattee v. Ga. Ports Auth.*, 512 F. Supp. 2d 1372, 1377 (S.D. Ga. 2007); *Gray v. Royal*, 181 F. Supp. 3d 1238, 1253 (S.D. Ga. 2016).[68]

    Wentz could be heard clearly, and gave no indication he feared being overheard. *Cf. Wisconsin v. Duchow*, 749 N.W.2d 913, 920-21 (Wisc. 2008) (noting, among other factors,

---

[68] "Florida follows federal courts as to the meaning of provisions after which Chapter 934 was modeled," such as the reasonable expectation of privacy exception. *Minotty v. Baudo*, 42 So. 3d 824, 831 (Fla. 4th DCA 2010); *see also Stalley v. ADS Alliance Data Sys., Inc.*, 997 F. Supp. 2d 1259, 1269 (M.D. Fla. 2014). The plain language of the statute supports this view, as they require that the person "*exhibit*[] an expectation that such communication is not subject to interception." Fla. Stat. § 934.02(2) (emphasis added).

that courts should consider "the volume of the statements" and "the actions taken by the speaker to ensure his or her privacy" in evaluating the speaker's expectation of privacy); *U.S. v. Giraudo*, No. CR 14-534 CRB, 2016 WL 4073243, *8 (N.D. Cal. Aug. 1, 2016) (stating that the volume of oral communications is relevant to whether the speaker has a reasonable expectation of privacy, as is the proximity or potential of other individuals to overhear the conversation).  Wentz simply has not alleged, nor does the Video show, he took any steps to convey to Maass or Sandini that he intended the communications to be private.

### c. *The nature, intent, purpose, and content of the communication*

The purpose of the Florida communication was to share a story—which Wentz felt was an uplifting tale—with a woman whom Wentz had previously "never seen or met."[69]  *Cf. U.S. v. Shields*, 675 F.2d 1152, 1158 (11th Cir. 1982) ("[W]hen one reveals information to an individual, one takes the risk that one's confidence in that individual is misplaced."); *Hoffa v. United States*, 385 U.S. 293, 302 (1966) (holding that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it").  Wentz felt the moral of his story was "by connecting to students in their own, honest way, teachers can make a difference in their lives."[70]  He evinced no shame that his "own, honest way" was child abuse.  Indeed, Wentz "was happy to relay his story" to this new "young teacher,"[71] as he had done "on other occasions."[72]  Therefore, nothing in the nature, intent, purpose, or content of Wentz's story to Maass demonstrates that he had a reasonable expectation of privacy.

---

[69] Doc. 81, ¶ 28.
[70] Doc. 81, ¶ 37.
[71] Doc. 81, ¶ 37.
[72] Doc. 81, ¶ 35.

d. *Number of people present*

During the recorded conversation in Florida, an acquaintance of Wentz, Matthews, sat next to Wentz and Maass and engaged in the conversation.[73] As can be seen on the Video,[74] Wentz addressed Matthews directly at least once during the conversation regarding how a union in Virginia might handle Wentz's conduct.[75] The bartender also became involved in the conversation at times.[76]  In addition to Matthews and the bartender, Maass testified there were probably more than 10 other people at the bar, and Wentz could not commit to any estimate more accurate than "[l]ess than 1,000."[77] The Video clearly captures the background noise of at least several other conversations occurring off frame, but close enough to be picked up by the camera's microphone.[78] There were simply too many witnesses and potential eavesdroppers to the conversation to justify an expectation of privacy.  *See Dep't of Agric. & Consumers Servs. v. Edwards*, 654 So. 2d 628, 632-33 (Fla. 1st DCA 1995) (refusing to find an expectation of privacy where five individuals were parties to the conversation); *Cohen Bros., LLC v. ME Corp.*, S.A., 872 So. 2d 321, 324-25 (Fla. 3d DCA 2014) (refusing to find a reasonable expectation of privacy in a conference call). Likewise, in Kansas, there were too many people and potential eavesdroppers in the Panera Bread to justify an expectation of privacy. As a matter of law, Wentz had no reasonable expectation of privacy during his conversations with Maass and Sandini, and the Court should enter judgment in favor of Defendants on Counts I through IV.

---

[73] Ex. "H," p. 114, lns. 1-14.
[74] Video (https://www.youtube.com/watch?v=YheNaAEPev8) at 3:28.
[75] Ex. "B," p. 62, lns. 3-10; Video (https://www.youtube.com/watch?v=YheNaAEPev8) at 3:28.
[76] Ex. "H," p. 115,  lns. 8-15.
[77] Ex. "H," p. 114, lns. 15-22; Ex. "B," pp. 35-36, lns. 4-14.
[78] Ex. "B," p. 36, lns. 8-14;  *See generally,* Video (https://www.youtube.com/watch?v=YheNaAEPev8).

**IV.**  **Alternative Motion for Partial Summary Judgment on Economic Damages**

Alternately to awarding final summary judgment in Defendants' favor on the above grounds, the Court should enter partial summary judgment in favor of Defendants on Wentz' claims for economic damages in Counts I-VI. To resolve a discovery dispute related to Defendants' requests for documents and information related to Wentz' finances and income, Plaintiff's counsel stipulated that Wentz does not seek economic damages in this case.[79] Wentz confirmed the stipulation at his deposition.[80]  Based on Plaintiff's stipulation the Court should grant partial summary judgment in favor of Defendants on economic damages in Counts I-VI.

**V. Conclusion**

Project Veritas' reporting exposed Wentz's unacceptable behavior and statements – which he acknowledged as intolerable to his employer, his union, and society.  The Video led to his discipline, and afforded the School District the opportunity to provide further training to protect students from teachers who admit to physically threatening students. This case is an example of the importance of constitutional protection of independent media reporting; to permit Wentz to proceed on his claims would be an affront to the First Amendment.

Wentz's defamation claims also fail due to his inability to identify a false statement published by defendants, or the omission or juxtaposition of true statements to imply defamatory content. Finally, his federal and Kansas wiretapping claims fail because Maass and Sandini consented to the recording of their conversations, and Wentz had no reasonable expectation of privacy in the crowded Florida hotel bar or the Panera Bread.

---

[79] Counsel Email, p. 1 (attached as Exhibit "K").
[80] Ex. "B", p. 159, lns. 11-19.

WHEREFORE, Defendants respectfully request this Honorable Court render an Order entering final summary judgment in favor of Defendants and against Wentz, and reserving jurisdiction to award Defendants their costs and reasonable attorneys' fees pursuant to Florida's anti-SLAPP statute on proper motion.   Alternatively, Defendants respectfully request this Honorable Court render an Order entering partial summary judgment in favor of Defendants and against Wentz on his claims for economic damages in Counts I-VI.

Respectfully submitted this 2nd day of October, 2018,

/s/ Jason Zimmerman
Jason Zimmerman
Florida Bar No. 104392
Primary Email Address:
jason.zimmerman@gray-robinson.com
Secondary Email Address:
cindi.garner@gray-robinson.com
kathy.savage@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400 (32801)
P.O. Box 3068
Orlando, Florida 32802
Telephone:  (407) 843-8880
Facsimile:  (407) 244-5690
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will forward a true and correct copy of the foregoing via email to Cynthia Conlin & Associates cynthia@conlinpa.com; service@conlinpa.com; parker@conlinpa.com, 1643 Hillcrest Street, Orlando, Florida 32803.

/s/ Jason Zimmerman
Jason Zimmerman

25

## <u>INDEX TO EXHIBITS</u>

| <u>Exhibit</u> | <u>Document</u> |
|---|---|
| A | Interview Transcript |
| B | Excerpts of Deposition of Steve Wentz taken June 20, 2018 |
| C | Personnel Conference Summary |
| D | Letter of Apology by Steve Wentz |
| E | Declaration by Project Veritas |
| F | Declaration by Allison Maass |
| G | Declaration by Dan Sandini |
| H | Excerpts of Deposition of Allison Maass, taken July 9, 1028 |
| I | Email report |
| J | August 26, 2016 letter from Shannon S. Krysl, Chief Human Resources Officer |
| K | Counsel email confirming plaintiff is not seeking damages for lost wages |