IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.: 6:17-cv-0116-ORL-18GJK

STEVE WENTZ,

    Plaintiff,

vs.

PROJECT VERITAS, a Virginia Corporation; JAMES O'KEEFE, III; ALLISON MAASS; and BREITBART NEWS NETWORK, LLC, a Delaware Company,

    Defendants.

_____/

VIDEOTAPED DEPOSITION OF STEVE WENTZ

VOLUME
PAGES 1 - 192

Wednesday, June 20, 2018
10:04 a.m. - 2:04 p.m.

Gray Robinson, P.A.
301 East Pine Street
Suite 1400
Orlando, Florida 32801

STENOGRAPHICALLY REPORTED BY:
Lori Francis, RPR, FPR

1    A.   Well, in the flow chart, we refer to it as the
2    grandparents and parents.  In other words, we have AFT,
3    AFT Kansas, United Teachers of Wichita.  We have NEA,
4    Kansas NEA and United Teachers of Wichita.  It's sort of
5    a bizarre affiliation because we have some leeway as far
6    as decision making because of the dual affiliation, but
7    it is -- we are a part of both organizations.
8        **Q.   Okay.  And in terms of your role as an elected**
9    **official or officer, is that only for the United Wichita**
10   **Teachers?**
11       A.   United Teachers of Wichita, yes, that is
12   correct.
13       **Q.   And you're the president of that organization?**
14       A.   That is correct.
15       **Q.   How long have you been the president of that?**
16       A.   Three years.
17       **Q.   How long is that term?**
18       A.   Three years and I was re-elected.  In fact,
19   June 15th of 2015 is when I took office.  The election
20   was in March of 2015, and then I was re-elected this
21   past March.
22       **Q.   Did you have an opponent?**
23       A.   This last time?
24       **Q.   Yes, sir.**
25       A.   No.

```
 1      Q.  Do you know that your lawyer has them?
 2      A.  I do.
 3      Q.  Have you watched them?
 4      A.  I have not.
 5      Q.  Would you be able to identify the portions of
 6   the unedited videos that would add context?
 7      A.  I believe so.
 8      Q.  So there's a way that we could have put this
 9   video -- we meaning my clients could have put this video
10   together for it to be nondefamatory?
11          MS. CONLIN:  Object to form.
12      A.  I have no idea.
13   BY MR. MAGRUDER:
14      Q.  Anything else as of second 50 that you have a
15   problem with on the video so far?
16          MS. CONLIN:  Object to form.
17      A.  No.
18              (Video played:)
19          MR. WENTZ:  It didn't happen.  I never said
20      that to a kid at school.
21          (Music played:)  Sometimes you just gotta tell
22      it like how it is, ya know.  Look at his face.
23              (Video paused.)
24          THE WITNESS:  Okay.
25   BY MR. MAGRUDER:
```

```
 1      A.  There's a difference between what's accurate
 2  and what's truthful.
 3      Q.  Okay.  So is it true that you've lied?
 4      A.  Yes.
 5      Q.  Is it true that you've lied in this context?
 6          MS. CONLIN:  Object to form.
 7  BY MR. MAGRUDER:
 8      Q.  Let me ask you this way:  Isn't it true that
 9  you told Ms. Maass that you told a student I will kick
10  your fucking ass?
11          MS. CONLIN:  Object to form.
12      A.  That's true.
13  BY MR. MAGRUDER:
14      Q.  Is it true that you told Mr. Sandini I never
15  said that to a student at school?
16          MS. CONLIN:  Object to form.
17      A.  Yes.
18  BY MR. MAGRUDER:
19      Q.  Whether or not that actually occurred, you
20  either lied to Ms. Maass or Mr. Sandini, correct?
21          MS. CONLIN:  Object to form.
22      A.  I disagree.
23  BY MR. MAGRUDER:
24      Q.  How -- how -- you said that you told a student
25  that you would kick his fucking ass at school to Ms.
```

Case 6:17-cv-01164-GKS-GJK   Document 84-2   Filed 10/02/18   Page 5 of 19 PageID 751

Page 25

1  **Maass, correct?**
2  A.  Correct.
3  **Q.  And you told Mr. Sandini, "I never said that**
4  **to a student at school," correct?**
5  A.  That's correct.
6  **Q.  So both of those statements can be true?**
7  A.  I believe so.
8  **Q.  Can you explain that?**
9  A.  Absolutely.
10 **Q.  All right.**
11 A.  If you are in public education and dealing
12 with some of these tough kids, you would understand that
13 sometimes -- in fact, I would argue that more often than
14 not being real, quote-unquote, if you'll talk to these
15 kids, they talk about the importance of being real is
16 absolutely paramount.
17 **Q.  So that sounds to me -- and I don't want to**
18 **testify for you here -- that you're saying that there's**
19 **a justification or a reason why what you told that**
20 **student was okay.  And that's fine and we'll get to that**
21 **later in the deposition.**
22 **What I'm asking you is how can you say that the**
23 **statement "I told a kid at school I will kick his**
24 **fucking ass" and then the statement to a different**
25 **person "I never told a kid at school that I would kick**

www.phippsreporting.com
888-811-3408

```
 1      school.
 2              (Video paused.)
 3      BY MR. MAGRUDER:
 4          Q.  Do you remember what statement he was asking
 5      you about there?
 6          A.  Yes.
 7          Q.  What statement was that?
 8          A.  The statement did I ever tell a student I
 9      would kick his fucking ass.
10          Q.  And you answered that question negatively?
11          A.  I did.
12          Q.  Is that a true answer?
13          A.  No.
14          Q.  It's a false answer?
15          A.  It's a false answer.
16          Q.  Does that make you a liar?
17          A.  No.
18          Q.  Okay.  Anything else wrong with the video so
19      far?
20          A.  Oh, I think there's a lot of things wrong with
21      the --
22          Q.  Sorry.  Anything we haven't talked about yet?
23          A.  No.
24          Q.  Okay.
25                  (Video played:)
```

```
 1    the video is -- we're at 2:20 on the video, I think.
 2    There's at least one other person in the frame.
 3         A.   Uh-huh.
 4         Q.   Do you remember about how many other people
 5    were there?
 6         A.   I have no idea.
 7              MS. CONLIN:  Object to form.
 8    BY MR. MAGRUDER:
 9         Q.   Were there ten other people in the bar?
10              MS. CONLIN:  Object to form.
11         A.   I have no idea.  It was a restaurant and a bar
12    and I wouldn't even hazard a guess.
13    BY MR. MAGRUDER:
14         Q.   I mean, less than 100?
15         A.   I do not know.  Less than 1,000, yes.
16         Q.   Were there more people than you, Ms. Maass,
17    whoever the gentleman is that's in the frame right now?
18              MS. CONLIN:  Object to form.
19         A.   Yes.
20    BY MR. MAGRUDER:
21         Q.   Were there ten more?
22         A.   I do not know.
23         Q.   Was there anybody else sitting at the bar with
24    you three?
25         A.   I do not recall.
```

| | |
|---|---|
| 1 | **Q. Is there a bartender there?** |
| 2 | MS. CONLIN: Object to form. |
| 3 | A. Not in that frame, but I'm certain there's a |
| 4 | bartender. |
| 5 | BY MR. MAGRUDER: |
| 6 | **Q. Somebody served you that drink?** |
| 7 | A. That's correct. |
| 8 | **Q. All right. We'll listen to it again when it** |
| 9 | **starts, but it's noisy. It sounds like there are other** |
| 10 | **conversations happening.** |
| 11 | A. Okay. |
| 12 | **Q. Would you agree there are other people in the** |
| 13 | **room not on frame?** |
| 14 | A. Yes. |
| 15 | MR. MAGRUDER: Go back to 2:20 and just play |
| 16 | from there. |
| 17 | (Video played:) |
| 18 | MR. WENTZ: Wichita State asked me to come out |
| 19 | and talk to their new teachers in education about |
| 20 | classroom discipline and I went -- ex military, I'm |
| 21 | sure you -- I mean, you know, there were times in |
| 22 | my class where I had a kid do something crazy and, |
| 23 | you know, I told him when the bell rings -- I said, |
| 24 | hang on, hang on a minute, I wanna talk to you. So |
| 25 | the bell rings and everybody leaves and I go over, |

| | |
|---|---|
| 1 | Don't you feel responsible to your constituents? |
| 2 | MR. WENTZ:  You're a piece of work, Dan.  You |
| 3 | are a piece of work. |
| 4 | MR. SANDINI:  Nobody punched out.  Nobody |
| 5 | punched in back at the -- did you punch out at the |
| 6 | office? |
| 7 | MR. WENTZ:  I don't have to punch out. |
| 8 | MR. SANDINI:  We'll probably get in touch with |
| 9 | the union here -- |
| 10 | MR. WENTZ:  Okay. |
| 11 | MR. SANDINI:  -- maybe the NEA as all.  We'll |
| 12 | talk to them because when there's a specific |
| 13 | allegation -- we have, you know, specific |
| 14 | allegations about my nephew that said that you took |
| 15 | him aside and said, I am going to kick your fucking |
| 16 | ass. |
| 17 | MR. WENTZ:  I've heard what you said. |
| 18 | MR. SANDINI:  And you say you did not say it? |
| 19 | (Video paused.) |
| 20 | THE WITNESS:  Can you pause that for a second? |
| 21 | I remember specifically at that point that I was |
| 22 | concerned about his -- his language. |
| 23 | BY MR. MAGRUDER: |
| 24 | **Q.  Which language?** |
| 25 | A.  When he kept saying "fucking" over and over. |

| | | |
|---|---|---|
| 1 | Q. | Is that -- |
| 2 | A. | That's why I said -- that's why I -- that concerned me. |
| 4 | **Q.** | **What's concerning about that language?** |
| 5 | A. | I didn't like it. |
| 6 | **Q.** | **Do you use that word?** |
| 7 | A. | I have. Do you? |
| 8 | **Q.** | **I have.** |
| 9 | A. | Yeah. |
| 10 | **Q.** | **I haven't used it to a student. Have you?** |
| 11 | A. | Are you a teacher? |
| 12 | **Q.** | **No, sir.** |
| 13 | A. | Well, why would you use it to a student? |
| 14 | **Q.** | **Let me explain how this works. I ask questions; you answer them.** |
| 16 | | **Is the word "fucking" an inappropriate word to use in public?** |
| 18 | | MS. CONLIN: Object to form. |
| 19 | BY MR. MAGRUDER: | |
| 20 | **Q.** | **You brought this up; I didn't. You said you were concerned about his language.** |
| 22 | A. | I'd say context. |
| 23 | **Q.** | **Okay. Panera is an inappropriate place to use the word "fucking"?** |
| 25 | A. | In my opinion. |

```
 1      A.  I understand --
 2      Q.  -- correct?
 3      A.  -- what monetary means, sir.
 4      Q.  And injunction, injunctive relief, correct?
 5      A.  Yes.
 6      Q.  You want this video taken down?
 7      A.  Yes.
 8      Q.  You understand it's your obligation to prove
 9   your case, correct?
10      A.  Yes.
11      Q.  All right.  I'm asking -- it sounds like one
12   of the defenses that you made in the investigation
13   following this incident by the district and you're
14   sitting here today saying that there are some contexts
15   in which it's appropriate to use the word "fucking" to a
16   student in class, that sometimes there might be some set
17   of circumstances where that would be an appropriate
18   thing for a teacher to do; is that correct?
19      A.  Say that last part again.
20      Q.  Is it your contention that there are some set
21   of circumstances which would justify the use of the word
22   "fucking" by a teacher to a student in a classroom?
23      A.  Yes.
24      Q.  Can you please give us an example of such a
25   set of circumstances?
```

1    A.  No.

2    **Q.  You're refusing to answer that question?**

3    A.  I don't have an example.

4    **Q.  But you think that there is an example?**

5    A.  I think there could be.

6    **Q.  But you cannot provide one?**

7    A.  That is correct.

8    MS. CONLIN:  Object to form.

9    MR. MAGRUDER:  Let's keep going.

10    (Video played:)

11    MS. MAASS:  You've done this with students?

12    MR. WENTZ:  I've done this more than once and

13 I said, But I'll guarantee you I will kick your

14 fucking ass.

15    MR. SANDINI:  How many others are there, I

16 guess, is something I'd like to know?

17    MR. WENTZ:  Well, I guess we'll find out.

18    MR. SANDINI:  Okay.

19    NARRATOR:  We've been contacted by parents and

20 students across the country reacting to our last

21 few teachers union videos about similar experiences

22 they've had.  Now we strongly encourage any student

23 who had been threatened by Mr. Wentz to come

24 forward and contact us at Projectveritas.com.

25    It's clear Wentz doesn't want to own up to his

1    BY MR. MAGRUDER:
2        Q.  All right.  So now that we're at the end of
3    the video, I want to be very clear with this question,
4    so stop me if you don't understand.
5        Was there any statement or publication in that
6    video about you that is literally false?
7            MS. CONLIN:  Object to form.
8        A.  Say that again.
9    BY MR. MAGRUDER:
10       Q.  Was there any statement or publication in that
11   video about you which was -- which was false, which was
12   not true?
13       A.  Yes.
14       Q.  Which statement?
15       A.  Well, I believe all of them put together in an
16   edited video 34 times imply a whole slew of falsehoods
17   about me not caring and being a dangerous person.
18       Q.  So I appreciate that answer.  I understand you
19   have different causes of action.  One of them is
20   defamation by implication, and you just answered that
21   question, that the way that it was edited implies some
22   falsehood.  That's not my question, though.
23       My question is, was there a statement in the video
24   or publication in the video about you which is actually
25   false?

```
 1      A.  I don't know.
 2      Q.  Do you -- we just watched it.
 3      A.  I understand that.
 4      Q.  Would it be helpful if we watched it again?
 5      A.  We can watch it all day.  I don't know if that
 6   answers the question.
 7      Q.  Was there --
 8      A.  I'm not an attorney.
 9      Q.  You know the difference between a true and
10   untrue statement?
11      A.  I know the difference between accuracy and
12   truth.
13      Q.  Was there a statement or publication in that
14   video that wasn't accurate about you?
15      A.  There were a number of them.
16      Q.  Can you --
17      A.  I think any of those that -- for example,
18   particularly, again, during the song that they attached
19   to it.
20      Q.  Okay.  The lie reference, look at his face,
21   look at his eyes, see how he lies?
22      A.  That's correct.
23      Q.  So you didn't lie.  Is that your testimony
24   today?
25          MS. CONLIN:  Object to form.
```

1     A.  My testimony would be that in its entirety the
2  way that this is projected is defamatory.
3  BY MR. MAGRUDER:
4     **Q.  I'm not talking about that.  I get that, and**
5  **we'll get to that.**
6     **What I want to know is, was there a particular**
7  **statement or publication in the video that is not true**
8  **or accurate?**
9        MS. CONLIN:  Object to form.
10    A.  I don't know.
11 BY MR. MAGRUDER:
12    **Q.  How can we -- how would you be able to know?**
13    A.  I'm not the attorney.
14    **Q.  This isn't a legal question.  I just want to**
15 **know if you think that there was a statement or**
16 **publication made in that video about you that's not**
17 **accurate.**
18       MS. CONLIN:  Object to form.  Asked and
19    answered.
20    A.  I don't know.
21 BY MR. MAGRUDER:
22    **Q.  You cannot identify one as we sit here today?**
23       MS. CONLIN:  Object to form.  Asked and
24    answered.
25    A.  I'm not prepared to do so.

```
 1    BY MR. MAGRUDER:
 2        Q.  If we watch the video again, would you be
 3    prepared?
 4        A.  Maybe.
 5        Q.  Do you want to do that?
 6        A.  That's -- it's your deposition.
 7        Q.  As -- we just watched the entirety of the
 8    video, correct?
 9        A.  We did.
10        Q.  And --
11        A.  We watched the entirety of the edited video 34
12    times.
13        Q.  The video in question, the defamatory video --
14        A.  That is correct.
15        Q.  -- in question?
16        As we sit here right now, you cannot tell me, other
17    than the rap song where he says that you've lied, a
18    statement or publication that was about you and isn't
19    true, correct?
20            MS. CONLIN:  Object to form.
21        A.  No.
22    BY MR. MAGRUDER:
23        Q.  It's not correct?
24        A.  I believe that that's not correct.
25        Q.  Which other statement in the video about you
```

```
 1   is not true and accurate?
 2        A.  I don't know.
 3        Q.  Who is Joey Matthews?
 4        A.  I believe he is the individual who was blurred
 5   in the video.
 6        Q.  Do you know Joey Matthews?
 7        A.  I believe he is a retired member of Virginia,
 8   perhaps, National Education Association.  I believe he's
 9   retired now.  To be honest, I wasn't sure of his name,
10   if it was Jerry or Joey or even the last name.
11        Q.  Had you met him before --
12        A.  No.
13        Q.  Do you know names of any other people?  We're
14   talking about two different events.  I just want to be
15   clear.
16        A.  Okay.
17        Q.  I'm talking about the conference now --
18        A.  Okay.
19        Q.  -- in the bar.
20        A.  Right.
21        Q.  Do you know the name of any other individual
22   in that bar?
23        A.  I do not.
24        Q.  Do you have -- did you pay for the drinks that
25   night?
```

```
 1    it, pull the shades down, pull all my shit out of my
 2    pocket and I go, do you really want to kick my ass?"
 3    He said, Did you say those words in June 2015 at the
 4    hotel bar in Orlando?  And you responded yes.
 5       Is that true?
 6       A.  Yes.
 7       Q.  Did you say those words?
 8       A.  I did.
 9       Q.  Do you deny making any of the other statements
10    that exist in the video?
11          MS. CONLIN:  Object to form.
12       A.  Say that again.
13    BY MR. MAGRUDER:
14       Q.  The video is, at least in part, recordings of
15    you, correct?
16       A.  That is correct.
17       Q.  And the statements that the video show --
18       A.  If it came out of my mouth, I said it.
19       Q.  You're not alleging that there was any
20    editing, audio editing of words?
21       A.  No.
22       Q.  So everything that you're depicted as saying
23    in that video you said?
24       A.  That is correct.
25       Q.  All right.  I think probably we'll -- do you
```

| | |
|---|---|
| 1 | A.  I don't understand your question. |
| 2 | **Q.  They're your words, not mine.  You say that** |
| 3 | **your -- as a result of the video --** |
| 4 | A.  I thought we just crossed that off. |
| 5 | **Q.  Is it okay -- do you -- would you agree that** |
| 6 | **we can cross off that last phrase of that paragraph?** |
| 7 | A.  I would agree if -- as to business relations, |
| 8 | the way I have been affected is people that don't know |
| 9 | me and only know me through an edited video now view me |
| 10 | in a way that is extremely tainted and honestly untrue. |
| 11 | **Q.  So my question is, are you seeking any** |
| 12 | **damages, economic damages in this case related to the** |
| 13 | **loss of some potential business endeavor or prospective** |
| 14 | **business relationship in this case?** |
| 15 | A.  I am not. |
| 16 | **Q.  Okay.  All right.** |
| 17 | A.  You're referring to monetary? |
| 18 | **Q.  Correct.** |
| 19 | A.  Yeah, that's fine. |
| 20 | **Q.  All right.  So then the next category -- I'm** |
| 21 | **kind of going backwards here.  You say that you've** |
| 22 | **suffered mental anguish.** |
| 23 | A.  Yeah, it's been very stressful. |
| 24 | **Q.  Okay.** |
| 25 | A.  I want to -- I want to clarify.  You know, |