Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------X

DEMOCRACY PARTNERS, LLC, et     :

al.,                            :

                                :   Case No:

        Plaintiffs              :   1:17-CV-1047-ESH

                                :

            -vs-                :   Pages 1 - 248

                                :

PROJECT VERITAS ACTION FUND,    :

et al.,                         :

                                :

        Defendants              :

------------------------------X

Videotape Deposition of Lauren Windsor

Washington, D.C.

Wednesday, July 18, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  413863

MAGNA LEGAL SERVICES

(866) 624-6221

EXHIBIT B



Page 2

1

2

3

4

5

6                              Wednesday, July 18, 2018

7                              (9:02 a.m.)

8

9    Videotape Deposition of Lauren Windsor, held at the

10   offices of:

11

12        Verdi & Ogletree PLLC

13        1325 G Street, N.W.

14        Suite 500

15        Washington, D.C.  20005

16

17

18   Pursuant to notice, before Kathleen M. Vaglica, RPR,

19   RMR, a Notary Public in and for the District of

20   Columbia.

21

22



```
 1                    A P P E A R A N C E S

 2

 3

 4     COUNSEL FOR DEFENDANTS

 5          PAUL A. CALLI, ESQUIRE

 6          CHAS SHORT

 7          Calli Law, LLC

 8          One Flagler Building

 9          14 Northeast 1st Avenue, Suite 1100

10          Miami, FL  33132

11          (786) 504-0911

12          pcalli@calli-law.com

13

14          KERRY BRAINARD VERDI, ESQUIRE

15          Verdi & Ogletree PLLC

16          1325 G Street, N.W., Suite 500

17          Washington, D.C.  20005

18          (202) 449-7703

19          kverdi@verdiogletree.com

20

21

22
```



1        STEPHEN R. KLEIN, ESQUIRE

2        Statecraft PLLC

3        1629 K Street, N.W., Suite 300

4        Washington, D.C.  20006

5        (202) 804-6676

6        steve@statecraftlaw.com

7

8     COUNSEL FOR PLAINTIFFS

9        JOSEPH E. SANDLER, ESQUIRE

10       Sandler Reiff Lamb Rosenstein & Birkenstock,

11       P.C.

12       1025 Vermont Avenue, N.W., Suite 300

13       Washington, D.C.  20005

14       (202) 479-1111

15       sandler@sandlerreiff.com

16

17    ALSO PRESENT

18       GLEN FORTNER, VIDEOGRAPHER

19

20

21

22



1                     CONTENTS

2

3  EXAMINATION OF LAUREN WINDSOR          PAGE

4  BY MR. CALLI                              7

5

6                  E X H I B I T S

7  NUMBER                                 PAGE

8

9   1     1/10/2017 E-mail Chain            32

10  2     1/7/2017 E-mail                   70

11  3     1/6/2017 E-mail                   72

12  4     1/6/2017 E-mail                   73

13  5     11/16/2016 Memorandum             85

14  6     Lauren Windsor Visitor Name Tag   156

15

16

17

18

19

20

21

22



1                  P R O C E E D I N G S

2          THE VIDEOGRAPHER:  We are now on the

3    record.  This begins Videotape Number 1 in the

4    deposition of Lauren Windsor in the matter of

5    Democracy Partners v Project Veritas, et al.

6    Today's date is July 17, 2018.  The time is 9:02.

7    This deposition is being taken at 1325 G Street,

8    Northwest, Washington, D.C.

9          The videographer is Glen Fortner of Magna

10   Legal Services, and the court reporter is Kathy

11   Vaglica of Magna Legal Services.  Will counsel and

12   all parties present state their appearance and whom

13   they represent.

14          MR. SANDLER:  Joseph Sandler of the law

15   firm of Sandler Reif for the plaintiffs.

16          MR. CALLI:  My name is Paul Calli along

17   with Steve Klein, Chas Short, and Kerry Verdi.  We

18   represent Project Veritas Action Fund, Project

19   Veritas, James O'Keefe, and Allison Maass.

20          THE VIDEOGRAPHER:  Will the court reporter

21   please swear in the witness.

22          Thereupon,



1                     Lauren Windsor,

2   a witness, called for examination by counsel for the

3   Defendants and, after having been sworn by the

4   notary, was examined and testified as follows:

5        EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6   BY MR. CALLI:

7        Q.   What is your name?

8        A.   Lauren Windsor.

9        Q.   Ms. Windsor, I'm going to show you some

10  videotape regarding an internship that Allison Maass

11  had at Democracy Partners and related matters.  Do

12  you understand?

13       A.   I do.

14       Q.   So and what was produced to Mr. Sandler as

15  PVA14009, I want to play a clip at 516, please.

16            (Plays video clip.)

17  BY MR. CALLI:

18       Q.   Who was the man speaking off camera?

19       A.   Ryan Clayton.

20       Q.   C-L-A-Y-T-O-N?

21       A.   Yes.

22       Q.   When he asked Allison, was he referring to



1    use it with the gmail Lauren Windsor and the Lady

2    Libertine.

3         A.    It's just a number I like.

4         Q.    Is there any significance to the reason

5    why you like it?

6         A.    Just a lucky number.

7         Q.    Why is it lucky?  What's, you know --

8    maybe somebody has eight and they say that's lucky

9    because, you know, when I was eight or I hit eight

10   or I won eight.  Why is 27 lucky?

11        A.    It goes back to high school, I guess, a

12   girlfriend of mine and I.

13        Q.    Okay.  Okay.  Do you know who Steve, with

14   a V, Wentz, W-E-N-T-Z, is?

15        A.    I do.

16        Q.    How do you know who Steve Wentz is?

17        A.    Because he was, has current litigation

18   against your client.

19        Q.    Okay.  Where?  Pending like --

20        A.    I think it is in Florida.

21        Q.    Okay.  Have you ever spoken to Steve

22   Wentz?



Page 194

1          A.    I have, yeah.

2          Q.    On how many occasions?

3          A.    And by spoken you mean written

4     communications, telephonic communications?

5          Q.    Spoken would be verbal either in person or

6     over the telephone, and you can let me know which

7     one it is.  Written would be written.

8          A.    Okay.  Just wanted to clarify.

9          Q.    So how many times have you spoken with

10    Mr. Wentz?

11         A.    We've met in person, I think, twice and

12    spoken on the phone a couple times.

13         Q.    Did you use your cell phone to speak to

14    him?

15         A.    Yes.

16         Q.    When is the last time you verbally orally

17    communicated with Mr. Wentz?

18         A.    I think it was several months ago, but I

19    don't remember the exact date.

20         Q.    Have you preserved all your communications

21    that are in writing with Mr. Wentz?

22         A.    I have.



1      Q.   Where did you meet him on each occasion in

2  person?

3      A.   The first time was at the Marriott

4  Wardman.

5      Q.   Where is that?

6      A.   In northwest D.C., Glover Park.

7      Q.   When was that?

8      A.   I believe sometime last year.

9      Q.   Who arranged that meeting, you or him?

10  Who requested it?

11      A.   I don't recall.

12      Q.   Okay.  Had you spoken to him on the

13  telephone before that meeting?

14      A.   Most likely.

15      Q.   How did, how did it come about that you

16  first communicated?  Did you reach out to him?

17      A.   Yes.

18      Q.   By phone or e-mail?

19      A.   It would have been by e-mail.

20      Q.   What -- do you have that e-mail preserved

21  as part of everything you preserved?

22      A.   It should be, yeah.



1      Q.   What was the purpose of you reaching out

2   to Mr. Wentz?

3      A.   To get information on the sting that he

4   was involved in for the website.  It was for

5   research purposes.

6      Q.   To get information on the sting he was

7   involved in.  Is that, like, part of the lawsuit

8   that he has with Project Veritas?  Is that what you

9   mean?

10      A.   I guess so.  I don't know the details of

11   his litigation.

12      Q.   What did you discuss when you met with him

13   at the Marriott Wardman?

14      A.   He, I believe like our initial contact

15   before meeting, he had not been aware of the, that

16   it was Allison, per se.  And so through our

17   conversation he was able to determine that it was

18   Allison Maass.

19      Q.   What, generally, what was his -- so

20   Allison Maass had an investigation that, into Wentz.

21   What is Wentz?  Who is he?

22      A.   He is the head of the teachers' union in



1    Wichita, the joint union.

2         Q.    Kansas?

3         A.    Wichita, Kansas, yeah.

4         Q.    But he lives in Florida is your

5    understanding?

6         A.    No, he does not live in Florida.

7         Q.    Oh, the litigation is in Florida?

8         A.    It's my understanding the litigation is in

9    Florida because that's where he was filmed, and it

10   was at a teachers' conference there.

11        Q.    So did you provide him with information

12   about --

13        A.    Your client?

14        Q.    About the experience of the internship at

15   Democracy Partners?  Did you share with him?

16        A.    I mean, we certainly commiserated on being

17   victims.

18        Q.    So was that the purpose -- I mean, that

19   was -- have you ever communicated with Cynthia

20   Conlin or Jennifer Reed, which are his attorneys?

21        A.    Yes.

22        Q.    Okay.  On the telephone, in person, and/or



1   by e-mail?

2        A.   E-mail and over the phone.

3        Q.   Have you ever met with them?

4        A.   No, I have not.

5        Q.   What information have you provided to

6   them?

7        A.   You know, I think, generally speaking, the

8   identification of the moles that were the operatives

9   that were involved in the sting against Steve.

10       Q.   Does Mr. Creamer know that you have met

11  with Steve Wentz and communicated with him and with

12  his lawyers?

13       A.   He may.  I don't know what he knows or

14  doesn't know.  I don't, I don't run all of my duties

15  through him.

16       Q.   Well, listen.  I'm trying to move it

17  along.  I didn't ask you what he knows or didn't

18  know.  Have you ever informed Mr. Creamer verbally

19  or in writing that you have communicated with

20  Mr. Wentz or his lawyers?

21       A.   I believe so.

22       Q.   Did he ever ask you to do that?



1        A.    No, he did not.

2        Q.    Did he ever tell you to stop doing that

3   when you let him know that you were doing that?

4        A.    No, not to my knowledge.

5        Q.    When was the last time you communicated

6   with those two attorneys for Mr. Wentz?

7        A.    I don't believe I've ever spoken with

8   Jennifer Reed.  It's Cynthia that I had the contact

9   with, but it's been many months.  I mean, I think

10   that I notified them that the website was up in

11   February.  January, February.

12        Q.    Was any of the information posted on the

13   website provided to you by either Mr. Wentz or any

14   one of his attorneys?

15        A.    The information involving that litigation,

16   I believe, is public information that I received in

17   a report from our co-counsels.

18        Q.    The information about the Wentz litigation

19   was provided to you by your co -- when you say your

20   co-counsels, who do you mean?

21        A.    Georgetown Institute For Public

22   Representation.



1      Q.   So they gathered information on the Wentz

2   litigation and gave it to you, and you put it on the

3   site?

4      A.   Well, it wasn't just the Wentz litigation.

5   It was a report of all of the known litigation,

6   past, present, and pending, against your clients.

7      Q.   Okay.  So that, that research came from

8   the Georgetown law clerk?

9      A.   Yes.

10     Q.   Do you still have that memo?

11     A.   Yeah.

12     Q.   When did you receive that memo?  Winter,

13   spring, summer, fall and year, generally.  Would

14   have been after the website was started in January

15   of 2017, so we know that's the earliest date it

16   could have been.  So moving forward from there.

17     A.   You have the chronology wrong.

18     Q.   Sorry.

19     A.   I launched the website in January of 2018.

20     Q.   2018.  There you go.

21     A.   And in order to launch it, I would have

22   needed that information for the litigation tab.



1      Q.   When you get to be my age, you forget

2  things.  So pre January 2018, so it was --

3      A.   I would imagine it was at some point in

4  December.

5      Q.   December of 20 --

6      A.   '17.

7      Q.   2017.  I didn't finish asking you 'cause

8  there's so much interesting information to me.  Did

9  you finish telling me all the e-mail addresses that

10  you've utilized?

11      A.   Where are we at?

12      Q.   I got off on -- I was asking you about 27,

13  and then I stopped asking about e-mail addresses.

14  You had three.  The last one you gave me was Lady

15  Libertine, so you've mentioned three.

16      A.   And you want the e-mail addresses I've had

17  from when to when?

18      Q.   The date was July or September 1 of,

19  July 1 of 2016 to June of 2017, so that one-year

20  period.

21      A.   Lauren@mikeluxmedia.

22      Q.   Okay.  That's four.  Just



1     lauren@mikeluxmedia?

2          A.    Mm-hmm.

3          Q.    Okay.   And it's Mike Lux or MLM?

4          A.    Mike Lux Media spelled out.

5          Q.    Okay.   Is there another one?

6          A.    So you have lauren@americanfamilyvoices,

7     lauren@mikeluxmedia, laurenwindsor27,

8     ladylibertine27, picturepoet27@yahoo.com.   I believe

9     that's all that fits within that time frame.

10         Q.    Do you know who Shirley Teter, T-E-T-E-R,

11    is?

12         A.    I do.

13         Q.    Have you spoken with Ms. Teter?

14         A.    No.

15         Q.    Have you met, have you e-mailed with Ms.

16    Teter?

17         A.    I believe I e-mailed her attorney.

18         Q.    Would that have been Jonathan Sasser,

19    Jeremy Falcone, Ralph Streza, S-T-R-E-Z-A, or more

20    than one of those?

21         A.    It would have been Ralph Streza.

22         Q.    How many times have you e-mailed with him?



1      A.   I don't remember.  I think it was in

2  conjunction with one of our attorneys.  With Yael.

3  Yael Bromberg, Y-A-E-L.

4      Q.   So you're saying you would have e-mailed

5  Ralph, and it would have been Ms. Bromberg on the

6  e-mail as well?

7      A.   I think that Yael was having conversations

8  with Mr. Streza.

9      Q.   Were you present for any of those

10  conversations?

11      A.   I don't think they were actual phone

12  conversations.  I think they were e-mail, but no, I

13  was not present for them I don't believe, but

14  it's -- I'm trying to recall the context in which we

15  had the conversation, but I believe that they were

16  doing research on the Shirley Teter claims and

17  videos.

18      Q.   When you say they, who do you mean?

19      A.   The Georgetown Institute For Public

20  Representation, our co-counsel.

21      Q.   Did Ms. Bromberg forward to you the

22  e-mail, any e-mails she sent or received from Ralph



1   Streza?

2       A.   I don't recall, but is there anything with

3   attorney-client privilege with Yael?

4           MR. SANDLER:  Not on that one.

5           MR. CALLI:  There's somebody there who's

6   not represented by the same lawyer, so --

7           THE WITNESS:  No, no, certainly, but my

8   communications with Yael regarding Ralph Streza.

9           MR. CALLI:  Well, I'm not asking --

10          MR. SANDLER:  He didn't ask you that.

11          MR. CALLI:  I'm asking if they were

12  forwarded.  I can ask you that, but I can't ask you

13  the substance.  If she hit forward, I can ask you

14  that.

15          THE WITNESS:  Okay.

16  BY MR. CALLI:

17      Q.   So do you know if she did, if Ms. Bromberg

18  forwarded you communications she had with Streza?

19      A.   I don't recall.

20      Q.   If she had, would you have preserved them

21  like you did for the Wentz matter?

22      A.   Yeah.



1        Q.    Have you ever communicated with any

2   officers or employees of the American Federation of

3   Teachers?

4        A.    I have.

5        Q.    Who?

6        A.    Bradford Murray, Jessica Rudder, Michelle

7   Ringuette.

8        Q.    How do you spell Michelle's last name?

9        A.    R-I-N-G-U-E-T-T-E.

10       Q.    Did you meet with any of those folks in

11  person?

12       A.    Yes.

13       Q.    Who?

14       A.    Brad Murray and Michelle Ringuette.

15       Q.    Where?  What state?  What jurisdiction?

16  What venue?

17       A.    In D.C.

18       Q.    So these people come here to meet you?

19       A.    Do they come here to meet me?  No.

20       Q.    You meet with them here?

21       A.    Yeah.

22       Q.    They are not from here?  They don't live



1    here?

2         A.   They live here.

3         Q.   Oh, the AFT.  Did Ralph Streza ever come

4    to D.C. and meet with you?

5         A.   Not with me.  I don't know.

6         Q.   With who?  Do you know if he met with Ms.

7    Bromberg?

8         A.   I don't believe so.  I think she would

9    have told me that.

10        Q.   When was the last time you communicated

11   with the folks who are officers or employees of AFT?

12        A.   Last week.

13        Q.   Why did you --

14        A.   This week.

15        Q.   Why did you communicate with them the week

16   of or prior to your deposition?

17        A.   The AFT had a conference in the past week

18   or two.  I believe it was in the past week, and I

19   talked with Brad about the possibility of

20   infiltration by your client.

21        Q.   Not Brad Woodhouse?

22        A.   Brad Murray.



1      Q.    Brad Murray.

2      A.    Bradford.

3            MR. SANDLER:  Murray?

4            THE WITNESS:  Bradford Murray, yeah.

5  BY MR. CALLI:

6      Q.    Have you ever discussed with anybody an

7  infiltration of Project Veritas?  Have you ever

8  communicated with anybody in any form about that?

9      A.    To infiltrate Project Veritas?

10     Q.    Yes.

11     A.    Other people have suggested it, but I

12 wouldn't infiltrate Project Veritas.  We have

13 ongoing litigation.

14     Q.    Well, I mean, you say other people have

15 mentioned it.  Who are the other people?

16     A.    I think just -- I don't recall specific

17 people, but just generally people within the

18 progressive movement know that I have developed this

19 resource, and people ask me if I've thought about

20 trying to infiltrate them.

21     Q.    Do you know, do you remember who's asked

22 you that?



```
 1        A.    I don't recall.

 2        Q.    So, if you weren't in litigation, would

 3   you consider it?

 4        A.    Probably not.

 5        Q.    Why?  Why not?

 6        A.    I don't think Joe would ever sign off on

 7   that.  Your clients are very litigious.

 8        Q.    Are they the plaintiffs in these cases?

 9        A.    I'm sorry?

10        Q.    Are they the plaintiffs in these cases

11   we're talking about?

12        A.    I don't know which cases you're talking

13   about.

14        Q.    Wentz, Teter, and AFT, the ones we're

15   talking about, not seeing.  Are they the plaintiffs

16   in those cases?

17        A.    I'm sorry.  I don't understand.

18        Q.    Very litigious.  Who brought the suit,

19   Mr. Wentz or Project Veritas?

20        A.    I believe Mr. Wentz did.

21        Q.    Ah.  Shirley Teter, who brought the suit?

22        A.    I believe that she did.
```

